## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LIBERTY CORPORATE CAPITAL LIMITED and AMTRUST CORPORATE MEMBER LIMITED, | ) ) ) |
| | ) Case No. 4:17-cv-2297 |
| Plaintiffs, | ) |
| | ) JURY TRIAL DEMANDED |
| v. | ) |
| | ) |
| NANAZ F. MACARTHUR, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

**COME NOW**, Liberty Corporate Capital Limited and AmTrust Corporate Member Limited (collectively, "Plaintiffs" or "Underwriters") subscribing to Individual Insurance Certificate No. 13396X12128M-037 (the "Policy") and file their Complaint for Declaratory Judgment against Nanaz F. MacArthur ("Defendant" or the "Insured") seeking a declaration of non-coverage as described herein. In support thereof, Underwriters allege as follows:

## JURISDICTION AND VENUE

1.

Policy No. 13396X12128M-037 provides certain coverage to the Insured, subject to the Policy's terms, conditions, limitations, and exclusions, for the period March 1, 2013, through February 28, 2018. A true and correct copy of the Policy is attached hereto as Exhibit "A."

2.

Liberty Corporate Capital Limited ("Liberty") is a corporation organized and existing under the laws of England and Wales with its principal place of business at 20 Fenchurch Street, London, United Kingdom EC3M 3AW.  For the purposes of diversity, Liberty is a citizen of the United Kingdom.

3.

AmTrust Corporate Member Limited ("AmTrust") is a corporation organized and existing under the laws of England and Wales with its principal place of business at 1 Great Tower Street, London, United Kingdom EC3R 5AA. For purposes of diversity, AmTrust is a citizen of the United Kingdom.

4.

Defendant MacArthur is a citizen of Missouri, and may be served with process at her place of residence, located at 43 Williamsburg Road, St. Louis, Missouri 63141.

5.

The Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with the state of Missouri.

6.

The Court has subject matter jurisdiction over each of the claims on diversity grounds. Pursuant to 28 U.S.C. § 1332, the Court has jurisdiction based on diversity of citizenship because Underwriters are diverse from Defendant and the amount in controversy exceeds $75,000.00.

7.

Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant resides in this district.

8.

This action is brought pursuant to 28 U.S.C. § 2201 and seeks declaratory relief as to Underwriters' obligations under the policy of insurance issued to Nanaz F. MacArthur for the policy period March 1, 2013 to February 28, 2018.

9.

Underwriters are uncertain as to their duties, rights, and obligations and file this declaratory judgment action to resolve questions of coverage under the insurance policy. An actual and justiciable dispute over those duties, rights, and obligations exists between the parties.

**BACKGROUND FACTS**

10.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

11.

Prior to her disability, the Insured worked as a self-employed Clinical Medical Esthetician at Nanaz Laser & Skin Care Clinic, where she performed skin care treatments for clients. She has since closed her practice.

12.

From 2010 through the present, Ms. MacArthur had symptoms relating to cervical stenosis, weakness of the hand, neurological conditions including neuropathy and mononeuritis, and muscle conditions including myalgia and myositis.

13.

In October 2010, the Insured exhibited symptoms of mononeuritis, myalgia and myositis.

14.

On or around May 4, 2011, the Insured was prescribed Celexa, an antidepressant, by her primary care physician.

15.

On or around December 16, 2011, the Insured reported experiencing tingling and numbness in her arms and hands and subsequently underwent an MRI of her cervical spine. The MRI noted,

in part, degenerative spondylosis at C3-4, C4-5 and C6-7 with mild disc protrusions at C4-5 and C5-6.

### 16.

In June 2012, the Insured reported experiencing tingling in her hands, bilateral hand weakness, bilateral carpal tunnel syndrome, reduced range of motion in her neck and back, and she complained of dropping things. She also experienced anxiety, depression, and fatigue.

### 17.

She was again prescribed Celexa, an antidepressant, by her primary care physician in 2012 because of these reported symptoms.

### 18.

On or before June 15, 2012, the Insured was prescribed prednisone, which is often used to treat arthritis.

### 19.

In August 2012, the Insured continued to experience anxiety and depression, as well as radiating pain into her arms.

### 20.

From 2013 to 2016, the Insured experienced back and neck pain, cervical stenosis and radiculopathy affecting her strength in both upper extremities, neuropathy, and issues with right hand swelling, numbness and weakness.

### 21.

On February 15, 2013, the Insured applied for permanent and total disability insurance. A true and correct copy of the Application for Permanent and Total Disability Insurance is attached hereto as Exhibit "B."

22.

On February 20, 2013, five days after applying for the Policy, and prior to the issuance of the Policy, the Insured had a neurological consultation with Dr. Thomas Forget, a neurosurgeon.

23.

The Insured was referred to Dr. Forget by Dr. Farrin Manian, the Insured's brother.

24.

At this appointment, on February 20, 2013, the Insured reported to Dr. Forget that she was losing motor function in her hands, as well as having radiating pain from her neck down to her shoulders and to her arms.

25.

On March 1, 2013, the Policy went into effect. Exhibit A.

26.

On March 31, 2014, the Insured reported to her primary care physician that was she having difficulty completing simple activities of daily living. She also reported that she was unable to stand at work and that while sitting, her legs would go numb.

27.

At that same appointment, she again presented with anxiety and depression.

28.

The Insured was prescribed Xanax, an antidepressant, by her primary care physician on or before March 31, 2014.

29.

On or before July 21, 2014, the Insured was prescribed Cymbalta, a nerve pain medication and antidepressant, by her primary care physician.

30.

In May 2015, the Insured received steroid injections in her hands.

31.

On or around July 14, 2015, the Insured presented to her primary care physician as tearful, inconsolable, and reclusive in her house, stating that she was unable to work. At this appointment, the Insured was referred by her primary care physician to a psychiatrist, Dr. Adam Sky.

32.

On August 28, 2015, the Insured was prescribed Zorvolex, a prescription medication for the treatment of osteoarthritis, by a pain management specialist.  At this appointment, the Insured indicated her extreme hand pain has been ongoing for at least a year.

33.

The Insured had at least two follow-up visits with her primary care physician for her depression, on November 13, 2015 and January 6, 2016.

34.

On or about September 24, 2015, Hanleigh Management, Inc. ("Hanleigh") received a Proof of Loss statement signed by the Insured, dated September 17, 2015. A true and correct copy of the Proof of Loss is attached hereto as Exhibit "C."

35.

The Proof of Loss states that the Insured became permanently and totally disabled on September 17, 2015 due to "osteoarthosis[sic] (715.09) joint pain/soreness." Ex. C at 3.

36.

Attached to the Proof of Loss was rheumatologist John Costello's attending physician's statement. According to Dr. Costello's statement, he first diagnosed the Insured with osteoarthritis on September 17, 2015.

37.

Dr. Costello's statement states that the Insured's symptoms first appeared in January 2014.

38.

According to Dr. Costello, the Insured became permanently and totally disabled on approximately September 17, 2015.

39.

Following receipt of the Proof of Loss, Hanleigh retained claims adjuster George Rodolakis ("Mr. Rodolakis") to investigate the Insured's claim. On September 29, 2015, Mr. Rodolakis sent a letter to the Insured requesting information needed to begin his evaluation of the Insured's claim.

40.

On October 20, 2015, Mr. Rodolakis sent a follow-up letter to the Insured requesting this information.

41.

On November 17, 2015, the Insured sent the requested documents to Mr. Rodolakis so that he could begin evaluating the claim.

42.

On December 24, 2015, Mr. Rodolakis received medical records from Dr. Nabil Ahmad, a pain management specialist, pertaining to his treatment of the Insured.

43.

For the next several months, Mr. Rodolakis attempted to obtain medical records from the Insured's other treating physicians, including records from Dr. Scheperle (the Insured's primary care physician), Dr. Costello (the Insured's rheumatologist), Dr. Forget (the neurosurgeon who evaluated the Insured days prior to the issuance of the Policy), and Dr. Manian (the Insured's brother who referred her to Dr. Forget).

44.

By January 6, 2016, the Insured's primary care physician deemed her osteoarthritis medicated and stable.

45.

On April 4, 2016, Mr. Rodolakis received medical records from Dr. Scheperle, the Insured's primary care physician, pertaining to his treatment of the Insured.

46.

On April 7, 2016, Mr. Rodolakis received medical records from Dr. Costello, the Insured's rheumatologist, pertaining to his treatment of the Insured.

47.

On July 19, 2016, August 15, 2016, August 24, 2016, and September 23, 2016, Mr. Rodolakis sent correspondence to the Insured requesting additional information needed to evaluate her claim.

48.

Following receipt of updated medical records from the Insured's treating physicians, Mr. Rodolakis sent a letter to the Insured on November 28, 2016, seeking information on her treatment of neck pain and hand weakness prior to October 2014 and information on the treatment provider who ordered an MRI of her cervical spine in 2012. A second letter was sent on January 3, 2017, as no response was received to the November 28, 2016 letter.

49.

On January 17, 2017, counsel for the Insured responded to Mr. Rodolakis' letter on the Insured's behalf, identifying Neurological Specialists of West County, Inc. as the provider who ordered the 2012 MRI.

50.

On February 7, 2017, Mr. Rodolakis received medical records from Neurological Specialists of West County, Inc. pertaining to their treatment of the Insured.

51.

The medical records received by Mr. Rodolakis confirm the allegations contained in Paragraphs 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 27, 28, 29, 30, 31, 32, 33, and 44 above.  This information was not known to Underwriters at the time the Policy was underwritten, and it was not disclosed by the Insured.

52.

On April 4, 2017, following the investigation of the Insured's claim and review of her provided medical records, Underwriters requested that the Insured submit to an Independent Medical Examination ("IME"). A true and correct copy of the IME letter is attached hereto as Exhibit "D."

53.

On May 5, 2017, the Insured attended an IME with Dr. Steven Baak, a rheumatologist with the Arthritis Center in Bridgeton, Missouri.

54.

On June 23, 2017, Dr. Baak submitted a report with his findings to Mr. Rodolakis. In his report, Dr. Baak concluded that the Insured suffers from chronic pain and fibromyalgia, which are related to psychiatric issues, including medication-related impairment, anxiety, and depression.

55.

Dr. Baak also found that the Insured has not exhausted all treatment for her fibromyalgia and chronic pain.

56.

On August 21, 2017, Underwriters sent a Reservation of Rights letter to the Insured. A true and correct copy of the Reservation of Rights letter is attached hereto as Exhibit "E."

## THE INSURING AGREEMENT

57.

Underwriters subscribed to Policy No. 13396X12128M-037 for the period of March 1, 2013 through February 28, 2018. Exhibit A.

58.

The Policy contains a choice of law provision which states that "[t]he Certificate is governed by the laws of the state of the Owner as listed on the schedule page." Policy, p. 1 of 10.

59.

The Policy provides coverage to the Insured for permanent and total disability, subject to the Policy's terms, conditions, exclusions, and endorsements. If coverage exists, the Policy provides a $1,000,000 lump-sum benefit for qualifying permanent and total disability. Policy, p. 3 of 10.

60.

The Policy states that for coverage to be triggered, there must be a "loss due to Injury and/or Sickness." Policy, p. 1 of 10.

10

61.

The Policy defines "Sickness" in two ways:

Sickness means any sickness, illness or disease that: (1)(a) is diagnosed or treated by a Physician while this Certificate is in force; and (b) is not a Pre-Existing condition as defined above; or (2) is a Pre-existing Condition but: (a) is declared on the Application for this certificate; and (b) is not excluded from coverage by name or specific description. Sickness includes Complications of Pregnancy.

Policy, p. 7 of 10.

62.

The Policy defines "Pre-Existing Condition" as follows:

**PRE-EXISTING CONDITION** means a sickness or accidental injury for which you:

- Received medical treatment, consultation, care or services;

- Took prescription medication or had medication prescribed; or

- Had symptoms or conditions that would cause a reasonably prudent person to seek diagnosis, care or treatment in the 12 months before your insurance or any increase in the amount of insurance under this certificate takes effect.

Policy, p. 7 of 10.

63.

Disability due to Sickness must result from a Sickness that manifests itself during the Policy period. Policy, p. 1 of 10.

64.

The Sickness must cause total disability to commence within one year of a covered Sickness. Policy, p. 1 of 10.

65.

The Policy defines "Permanently and Totally Disabled" as follows:

Permanently and Totally Disabled means, as a result of a covered Injury or Sickness, the Insured is totally unable to perform the substantial and material duties

11

of his or her regular occupation as shown on the Schedule for the entire Elimination Period and is not expected to recover for the remainder of his or her life. The Insured must also be under the regular care of a physician that is appropriate for the condition causing the disability.

Policy, Benefit Coverage Insert, p. 1 of 1.

66.

The Policy contains a Pre-Existing Condition Limitation, which states,

**Pre-Existing Condition Limitation**

This Certificate does not provide benefits for a loss due to a Pre-Existing Condition as defined in the Certificate unless: (1) the loss begins more than 1 year after the Effective Date Shown in the Schedule; or (2) We have underwritten and agree to cover such condition.

We will not pay benefits, or increase in benefit amount due to an elected increase in the amount of your insurance for a disability that results from a Pre-existing condition, if you have been actively at work for less than 12 consecutive months after the date your Disability insurance or the elected increase in the amount of such insurance takes effect under this certificate.

Policy, p. 1 of 10; p. 7 of 10.

67.

The Policy contains an exclusion, which states,

**Exclusions**

This Certificate does not cover any loss caused by, in whole or in part, or as a result of:

***

2. Any psychosis, neurosis, or neuropsychiatric illness including, but not limited to, any emotional anxiety or depression illness for which any form of psychiatric or psychological therapy is indicated or received.

Policy, p. 8 of 10.

## CAUSES OF ACTION

## COUNT I – DECLARATORY JUDGMENT

## THE INSURED'S OSTEOARTHRITIS/JOINT PAIN IS A PRE-EXISTING CONDITION NOT COVERED BY THE POLICY

68.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

69.

The Insured claims permanent and total disability due to osteoarthritis/joint pain. Ex. C.

70.

The Insured's osteoarthritis/joint pain is a Pre-Existing Condition under the Policy because it meets at least two of the three alternative bases of the Policy's definition of a Pre-Existing Condition, as stated below:

> **PRE-EXISTING CONDITION** means a sickness or accidental injury for which you:
>
> - Received medical treatment, consultation, care or services;
> - Took prescription medication or had medication prescribed; or
> - Had symptoms or conditions that would cause a reasonably prudent person to seek diagnosis, care or treatment in the 12 months before your insurance or any increase in the amount of insurance under this certificate takes effect.

Policy, p. 7 of 10.

71.

First, prior to the Policy going into effect, the Insured received medical treatment, consultation, care or services for her osteoarthritis/joint pain.

72.

As early as 2010, the Insured complained of joint pain in her hands, and her primary care physician even diagnosed her with mononeuritis, myalgia, and myositis.[1]

73.

In December 2011, the Insured reported pain, tingling, and numbness in her hands causing her doctor to order an MRI of her cervical spine in 2012. The MRI noted, in part, degenerative spondylosis at C3-4, C4-5, and C6-7 with mild disc protrusions at C4-5 and C5-6.

74.

The Insured reported to Dr. Forget on February 20, 2013, over a year before the Policy went into effect, that she was losing the use of her hands when she worked, and, more generally, the loss of fine motor skills in her hands.  Dr. Forget recommended a treatment plan for the Insured based on these complaints.

75.

The Insured therefore received medical treatment, consultation, care or services for her osteoarthritis/joint pain prior to the Policy's inception, satisfying the first of three independent bases under the Policy for having a pre-existing condition.

76.

Second, in the 12 months before the Policy went into effect, the Insured had symptoms or conditions that would cause a reasonably prudent person to seek diagnosis, care or treatment.

---

[1] Mononeuritis is a disorder of the nervous system that can result in severe pain, loss of motor ability, and loss of sensation in at least two separate areas of the body. Myalgia is pain in a muscle or group of muscles. Myositis is the inflammation of muscles. Weakness, swelling, and pain are the most common myositis symptoms.

77.

In the 12 months before the Policy went into effect, the Insured complained of the following symptoms: pain, tingling, and numbness; bilateral hand weakness; bilateral carpal tunnel syndrome; loss of fine motor skills; and the loss of use of hands while working.

78.

The symptoms described above are symptoms or conditions that would cause a reasonably prudent person to seek medical care or treatment. Indeed, these symptoms did cause the Insured to seek treatment with her primary care physician on multiple occasions and with Dr. Forget for a neurological consultation on February 20, 2013, before the Policy went into effect.

79.

The Insured's symptoms or conditions therefore satisfy the third of the three independent bases under the Policy for having a Pre-Existing Condition, as she had symptoms which caused her to seek treatment in the 12 months before her Policy went into effect.

80.

Underwriters are thus entitled to a declaration that the Insured's osteoarthritis/joint pain is a Pre-Existing Condition under the Policy under the first and third of the Policy's three independent bases for defining a Pre-Existing condition.

## COUNT II – DECLARATORY JUDGMENT

## THERE IS NO LOSS DUE TO INJURY OR SICKNESS UNDER THE POLICY

81.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

15

82.

Under the Policy, to trigger coverage, there must be a "loss due to Injury and/or Sickness." Policy, p. 1 of 10. The Insured's disability is not a loss due to Injury and/or Sickness according to the Policy's terms.

83.

The Policy defines "Sickness" in two ways:

Sickness means any sickness, illness or disease that: (1)(a) is diagnosed or treated by a Physician while this Certificate is in force; and (b) is not a Pre-Existing condition as defined above; or (2) is a Pre-existing Condition but: (a) is declared on the Application for this certificate; and (b) is not excluded from coverage by name or specific description.

Policy, p. 7 of 10.

84.

The Insured's osteoarthritis/joint pain is not a "Sickness" under either of these definitions.

85.

First, a "Sickness" is a sickness, illness or disease that (a) is diagnosed or treated by a Physician while this Certificate is in force; and (b) is not a Pre-Existing condition as defined by the Policy. Policy, p. 7 of 10.

86.

The Insured was treated by her physician for her osteoarthritis/joint pain from 2014 to 2017, which is during the Policy period.

87.

The Insured's osteoarthritis/joint pain, however, is a Pre-Existing Condition, as established in Count I, under the Policy's first and third definitions of a "Pre-Existing Condition."

16

88.

The Insured's osteoarthritis/joint pain therefore is not a "Sickness" under the first definition because although it is a disease that was formally diagnosed or treated by a physician during the Policy period, it also is a Pre-Existing Condition under the Policy.

89.

Second, a "Sickness" is a Pre-Existing Condition that: (a) is declared on the Application for this certificate; and (b) is not excluded from coverage by name or specific description. Policy, p. 7 of 10.

90.

The Insured's osteoarthritis/joint pain is a Pre-Existing Condition, as established in Count I.

91.

The Insured did not declare her osteoarthritis/joint pain on her Application for insurance. Exhibit B.

92.

As the Insured did not declare her Pre-Existing Condition on her Application, her osteoarthritis/joint pain is not a "Sickness" under the second definition of "Sickness" as provided by the Policy.

93.

Because the Insured's osteoarthritis/joint pain is not a "Sickness" under the Policy, there can be no loss due to Sickness, as required by the Policy for coverage.

94.

Underwriters are thus entitled to a declaration that no coverage exists for the Insured's claim because no loss due to Injury or Sickness occurred under the Policy.

## COUNT III – DECLARATORY JUDGMENT

## THE PRE-EXISTING CONDITION LIMITATION BARS COVERAGE

### 95.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

### 96.

The Policy's Pre-Existing Condition Limitation places certain additional limitations on coverage for a loss due to a Pre-Existing Condition.

### 97.

No coverage exists: (1) if the loss does not begin more than one year after the Policy's effective date; or (2) unless the Underwriters agreed to cover the Pre-Existing Condition. Policy, p. 1 of 10.

### 98.

The Policy does not provide coverage for the Insured's disability as the Insured's loss does not satisfy the Pre-Existing Condition Limitation's requirements.

### 99.

To be covered, the Insured's loss must have begun "more than 1 year after the Effective Date shown in the Schedule." Policy, p. 1 of 10. The Policy's effective date is March 1, 2013. Therefore, the Insured's loss must have begun *after* March 1, 2014.

### 100.

The Insured's loss, in fact, actually began *before* March 1, 2014.

### 101.

The following symptoms or events happened prior to March 1, 2014: (1) the Insured experienced tingling in her hands and feet, bilateral hand weakness, bilateral carpal tunnel

18

syndrome; dropping of items; (2) right hand swelling, numbness, and weakness; (3) loss of fine motor function; (4) challenges to completing simple activities of daily living because of pain in her hands; and (5) the Insured had a neurological consultation visit with Dr. Forget.

102.

These events demonstrate that the Insured's loss began prior to March 1, 2014, and, therefore, the Insured does not satisfy the provisions of the Pre-Existing Condition Limitation.

103.

Underwriters are thus entitled to a declaration that no coverage exists for the Insured's claim as the Pre-Existing Condition Limitation precludes coverage because the Insured's loss began more than one year after the Policy's effective date.

## COUNT IV – DECLARATORY JUDGMENT

### THE INSURED'S OSTEOARTHRITIS/JOINT PAIN DID NOT MANIFEST ITSELF WHILE THE POLICY IS IN FORCE AND HER TOTAL DISABILITY DID NOT COMMENCE WITHIN 1 YEAR OF A COVERED SICKNESS

104.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

105.

The Policy requires that "[d]isability due to Sickness must result from a Sickness that manifests itself while the Certificate is in force and causes Total Disability to commence within 365 days of a covered Sickness." Policy, p. 1 of 10.

106.

First, the Insured's sickness did not manifest itself during the Policy period as the Insured exhibited multiple symptoms of osteoarthritis/joint pain and received medical care or services for her osteoarthritis/joint pain prior to the Policy's March 1, 2013 inception.

107.

Second, the Insured's Total Disability did not commence within 365 days of a covered Sickness.

108.

The Insured's osteoarthritis/joint pain is not a covered Sickness, precluding coverage under the Policy.

109.

Even if the Insured's osteoarthritis/joint pain is a covered Sickness, the Insured's Total Disability commenced *after* 365 days of her covered Sickness.

110.

The Insured states in her Proof of Loss that her illness began in January 2014. Exhibit C. Underwriters dispute that the Insured's illness began this late, as she received significant medical care or services for her osteoarthritis/joint pain as early as June 2012.

111.

The Insured states that she became totally and permanently disabled on September 17, 2015. Ex. C at 2.

112.

Even if the Insured's illness began in January 2014, the Insured's permanent and total disability did not commence within 365 days of her illness.

113.

Therefore, the Insured's Total Disability does not commence within 365 of a covered Sickness.

114.

Underwriters are thus entitled to a declaration that no coverage exists for the Insured's claim as the Insured's osteoarthritis/joint pain did not manifest itself while the Certificate is in force and her Total Disability did not commence within 365 days of a covered Sickness.

## COUNT V – DECLARATORY JUDGMENT

## THE INSURED IS NOT PERMANENTLY DISABLED

115.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

116.

Under the definition of "Permanently and Totally Disabled," the Insured must be "not expected to recover for the remainder of his or her life." Ex. A.

117.

In his independent medical examination, Dr. Baak concluded that the Insured has not exhausted all treatment options for her chronic pain and fibromyalgia.

118.

As she has not exhausted all treatment options, she cannot be "not expected to recover" from her disability "for the remainder of her life."

119.

Underwriters are thus entitled to a declaration that no coverage exists for the Insured's claim because she is not permanently and totally disabled under the terms of the Policy.

## COUNT VI – DECLARATORY JUDGMENT

## THE INSURED'S OSTEOARTHRITIS/JOINT PAIN IS CAUSED BY PSYCHIATRIC ISSUES, WHICH ARE EXCLUDED BY THE POLICY

120.

Underwriters repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

121.

The Policy excludes any loss "caused by, in whole or in part, or as a result of … Any psychosis, neurosis, or neuropsychiatric illness including, but not limited to, any emotional anxiety or depression illness for which any form of psychiatric or psychological therapy is indicated or received."

122.

Dr. Baak, who conducted an independent medical examination of the Insured on May 23, 2017, found that the Insured suffers from chronic pain and fibromyalgia.

123.

Dr. Baak concluded that the Insured's loss of dexterity and fibromyalgia are related to her psychiatric conditions of anxiety and major depression disorder, and medication-related impairment.

124.

The Insured's claim for permanent and total disability is based on her disability due to joint pain, which Dr. Baak found is caused by her psychiatric issues.

125.

The Policy thus excludes coverage for the Insured's claim as her loss is caused, in whole or in part, by her psychiatric issues, including her anxiety and depression, and treatment thereof.

22

126.

Underwriters are thus entitled to a declaration of non-coverage for the Insured's claim because her loss is excluded by the Policy's exclusion for loss caused by neuropsychiatric illness.

**WHEREFORE,** Plaintiffs pray for:

(1)    The Court to declare that Defendant's osteoarthritis/joint pain is a Pre-Existing Condition under the Policy, barring coverage;

(2)    The Court to declare that no coverage exists for Defendant's claim as there is no loss due to Injury and/or Sickness under the Policy;

(3)    The Court to declare that no coverage exists for Defendant's claim as the Policy's Pre-Existing Condition Limitation precludes coverage;

(4)    The Court to declare that no coverage exists for Defendant's claim as her osteoarthritis joint pain did not manifest itself while the Policy is in force and her total disability did not commence within one year of a covered sickness;

(5)    The Court to declare that no coverage exists for Defendant's claim as she is not permanently disabled;

(6)    The Court to declare that no coverage exists for Defendant's claim as her loss is excluded by the Policy's exclusion for loss due to neuropsychiatric illness;

(7)    The Court to enter judgment in Underwriters' favor and against Defendant on any and all grounds set forth in this Complaint;

(8)    Plaintiffs recover their costs; and

(9)    Such other relief as the Court deems just.

Respectfully submitted this 23rd day of August, 2017.

/s/ Bradley R. Hansmann
Bradley R. Hansmann, #53160
**BROWN & JAMES, P.C.**
800 Market Street, Suite 1100
St. Louis, Missouri 63101
(314) 421-3400
(314) 421-3128 (FAX)
bhansmann@bjpc.com

and

Paul L. Fields, Jr., Esq.
Gregory L. Mast, Esq.
**FIELDS HOWELL LLP**
1180 W. Peachtree Street, Suite 1600
Atlanta, GA 30309
404.214.1250 – Telephone
404.214.1251 – Facsimile
*Attorneys for Plaintiffs*

#13827648